**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE BRITH SHOLOM FOUNDATION,** | : |
| **LUCINDA McBURNETTE and ABDUS SABUR** | : |
| | : |
| **Plaintiffs,** | : CIVIL ACTION |
| | : |
| **v.** | : |
| | : |
| **UNITED STATES DEPARTMENT OF** | : |
| **HOUSING AND URBAN DEVELOPMENT** | : NO. _____ |
| | : |
| **Defendant.** | : |

## AMENDED COMPLAINT AND EMERGENCY PETITION TO PREVENT FORECLOSURE SCHEDULED FOR FEBRUARY 26, 2010

### INTRODUCTION

*The Brith Sholom House* is a federally assisted, multifamily, low income housing project for senior citizens. This is an action to enjoin a nonjudicial foreclosure and sale of *The Brith Sholom House* at public auction by the United States Department of Housing and Urban Development ("HUD"), scheduled to take place on February 26, 2010.

"HUD receives vast sums of money and operates a variety of programs affecting fundamental aspects of the lives of many people, and its various units and divisions are necessarily assigned different aspects of the agency's total responsibilities. But whatever the difficulties, this process must always be coordinated to achieve the ultimate goals set by Congress, and the larger aspects of HUD's mission must not be lost in a maze of individual bureaucratic decisions by those having only limited responsibility and concerns."[1]

In this matter, as more fully explained below, and in the attached memorandum of law and exhibits, HUD and its officials have lost sight of its mission.  HUD has moved to foreclose

1

on *The Brith Sholom House* without just cause in an arbitrary and capricious manner. HUD, itself, has certified that *The Brith Sholom House* is in substantial compliance with all applicable State and local housing statutes, regulations, ordinances and codes. The owner of the *Brith Sholom House* has cured and will cure any alleged physical deficiencies and is able to cure any alleged monetary default.  HUD, however, has refused to allow the owner of the *Brith Sholom House* to cure the alleged monetary defaults and has initiated the foreclosure proceedings without just cause and without notice to the tenants.

## **PARTIES**

1.      Plaintiff *Brith Sholom Foundation* ("Foundation") is a Pennsylvania non-profit corporation.  The Foundation's principal place of business is located at 3939 Conshohocken Avenue, Philadelphia, PA.

2.      The *Brith Sholom Foundation* is the owner and mortgagor of *The Brith Sholom House*, which is located at 3939 Conshohocken Avenue, Philadelphia, PA.

3.      Plaintiff Lucinda McBurnette ("McBurnette") is a tenant at Brith Sholom House, apartment number 528.  McBurnette is a 68 year old African American female who has lived in her unit for the past 14 months.  McBurnette receives a monthly social security income of $972.  This is her sole source of income.  She currently pays $455 in rent for her efficiency apartment.

4.      Plaintiff Abdus Sabur ("Sabur") is a tenant at Brith Sholom Addition, apartment number 1132.  Sabur is a 65 year old African American male who has lived in his unit for the past 3 years.  Sabur receives a monthly social security income of approximately $650 and a monthly veteran's benefit of approximately $350.  This is his sole source of income.  He currently pays $455 in rent for his efficiency apartment.

---

[1] Kent Farm Company v. Hills et al., 417 F.Supp. 297, 302. (D.C. 1976).

5.      Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency with its local district office located at The Wanamaker Building, 100 Penn Square East Philadelphia, PA 19107-3380.

6.      "HUD" is the mortgagee of the *Brith Sholom House*.

## JURISDICTION

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1361 and 5 U.S.C. §705 et seq.

## VENUE

8.      Venue properly exists in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(e).

## BACKGROUND

9.      On January 25, 1962, Brith Sholom, a Jewish National Fraternal Society, organized and existing under the laws of the Commonwealth of Pennsylvania, resolved to adopt and executed a Deed of Trust, creating the *Brith Sholom Foundation* (See Deed of Trust, attached hereto as Exhibit A).

10.      The *Brith Sholom Foundation* ("Foundation") was formed as the eleemosynary branch of the National Fraternal Society exclusively for religious, charitable, scientific, literary or educational purposes.

11.      The Foundation was charged by Brith Sholom to establish the *Brith Sholom House,* a permanent national *Home* for senior citizens.

12.      On March 6, 1964, the Foundation executed its Articles of Incorporation under the Non-Profit Law of the Commonwealth of Pennsylvania.  (Articles of Incorporation at Decree, attached hereto as Exhibit B).

13.     The Foundation's Articles of Incorporation mandate the Foundation to collect and distribute funds exclusively for religious, charitable, scientific, literary and educational purposes, without the pecuniary gain or profit. (Articles of Incorporation at ¶ 3).

14.     The Foundation, in accordance with the Deed of Trust created and established the *Brith Sholom House*. Land was purchased and deeded to the Foundation on or about December 8, 1964 for the construction and operation of the *Brith Sholom House.*  (See Foreclosure Sale Bid Package at Exhibit C, p. 3, attached hereto as Exhibit X.)

15.     On September 1, 1966, the Foundation entered into a Regulatory and Loan Agreement pursuant to Section 202 of the National Housing Act with HUD for the property, known as the *Brith Sholom House* ("House").  (Project 202 Loan Agreement, attached hereto as Exhibit C). The construction of the House was completed in 1968.  (See Foreclosure Sale Bid Package--Property at a Glance, as Exhibit Y.)

16.     The Section 202 Loan Agreement required the Foundation to limit public occupancy to "elderly or handicapped families and persons as defined in the Housing Act of 1959 and any amendments thereto." (Project 202 Loan Agreement at 1).

17.     On or about December 14, 1971, the Foundation established an additional residence for senior citizens, located adjacent to the House.  This property is known as the *Brith Sholom Addition.*

18.      On December 13, 1972, the Foundation entered into a second Regulatory and Loan Agreement, pursuant to Section 236 of the National Housing Act, for the *Brith Sholom* Addition ("Addition."). (See Project 236 Loan Agreement, attached hereto as Exhibit D).  The construction of the Addition was completed in 1974.

4

19.     The Foundation has provided safe, secure, and affordable housing for senior citizens and persons with disabilities for over 45 years, free of discrimination, the stated mission of HUD.

20.     There are currently over 350 seniors that are permanent residents of the House, with an average age of 85 years.

21.     The Foundation does not own or operate the House and Addition for profit or for commercial gain.

22.     The "Foundation," a Jewish organization, has always owned and operated the House and Addition, providing safe, secure, and affordable housing for senior citizens, free of discrimination.

23.     The Foundation provides unique services to the residents which could never be duplicated by HUD, or any other individual or entity, in any meaningful manner.  These services include, but are not limited to, (a) Contracted Social Services; (b) Kosher meals in the community dining room; (c) Cleaning service; (d) Convenience store/delicatessen; (e) Beauty shop; (f) 24/7 nursing service; (g) Access to planned day-trips; (h) Various types of recreation; (i) Computers; (j) On-site library; and (g) On-site physicians.  McBurnette, Sabur and on information and belief the other tenants, value these services as extremely important to contributing to their well-being and health.

24.     The rent, which is well below market rates, includes all utilities.

25.     The Foundation subsidizes the residents' rents, which are substantially below market value.  McBurnette, Sabur and on information and belief the majority of the other tenants, are on fixed incomes and are not able to afford market value rent.

26.     The rents for each apartment range from $455 per month to $728 per month. (See Foreclosure Sale Bid Package-Property at a Glance.)

        a.     Of the 357 apartment units, 274 units have a current rental rate of $455 per month, including McBurnette and Sabur's apartments;

        b.     Of the 357 apartment units, 50 units have a current rental rate of $561 per month;

        c.     Of the 357 apartment units, 10 units have a current rental rate of $698 per month;

        d.     Of the 357 apartment units, 23 units have a current rental rate of $728 per month.

27.     If the scheduled foreclosure and sale of *The Brith Sholom House* is allowed to proceed, HUD will allow the rents to be substantially increased in the following manner:

        a.     The apartments currently renting for $455 per month, including McBurnette and Sabur's, will be permitted to be increased to $682 per month;

        b.     The apartments currently renting for $561 per month will be permitted to be increased to $781 per month;

        c.     The apartments currently renting for $698 per month will be permitted to be increased to $781 per month; and

        d.     The apartments currently renting for $728 per month will be permitted to be increased to $781 per month. (See Exhibit Y.)

28.     If the scheduled foreclosure and sale of *The Brith Sholom House* is allowed to proceed, the residents' monthly rent will no longer be subsidized by the Foundation.

McBurnette, Sabur and, on information and belief, the other tenants, would not be able to afford the possible increase in rent.

29.     The Foundation does not receive project-based Section 8 funds nor do its residents receive Section 8 rental voucher assistance.

30.     If the scheduled foreclosure and sale of *The Brith Sholom House* is allowed to proceed, HUD will not provide any current resident or future tenant with Section 8 assistance. (See Terms of Foreclosure Sale, attached hereto as Exhibit Z.)

31.     If the scheduled foreclosure and sale of *The Brith Sholom House* is allowed to proceed, HUD will allow any current resident to be evicted, subject to the terms of the current lease.  Since those leases are for one year terms and are month-to-month thereafter, and most of the residents have resided at the House and Addition for more than one year, they have virtually no real protection against eviction 30 days after the sale.   (See Terms of Foreclosure Sale, attached hereto as Exhibit Z.)

32.     HUD has certified that the House and the Addition are in substantial compliance with all applicable State and local housing statutes, regulations, ordinances and codes. (See Exhibit Z.)

## FACTS GIVING RISE TO THE PENDING FORECLOSURE

### *Inspections by HUD's Real Estate Assessment Center (REAC)*

33.     Inspections of multifamily properties, like the House are inspected by HUD's Real Estate Assessment Center (REAC).

34.     REAC is responsible for collecting data on HUD properties to assess the Physical condition of property, financial condition of the property, management capabilities of the owners or managers and resident satisfaction.  REAC inspectors are required to follow several guidelines promulgated by HUD when conducting REAC inspections.

35.     Pursuant to HUD's regulations, properties that receive inspection scores below 60 will be referred to the HUD Departmental Enforcement Center (DEC).

36.     There are two processes or appeal avenues available to challenge a physical inspection score: (1) technical reviews; and (2) database adjustments.

37.     The REAC Technical Review Process (Appeal Process) requires the property owner to request a technical review of the physical inspection score within 30 days of receiving the REAC Inspection report.  http://www.hud.gov/offices/reac/products /pass/pass_guidelines. cfm#isreview.

38.     Property owners are also permitted to request a database adjustment of the REAC Inspection.  This request must be made within 45 days after receipt of the REAC Inspection report.  Circumstances that may be addressed by a database adjustment, include but are not limited to, inconsistencies between local code requirements and REAC physical inspection protocols, property undergoing modernization work and adverse conditions beyond the owner's control. http://www.hud.gov/offices/reac/products /pass/pass_guidelines. cfm#isreview.


## Notice Of Default

39.     On December 9, 2008, HUD notified the Foundation that it was in violation of its Regulatory Agreement and Loan Agreements. (Letter from HUD to Foundation, dated December 9, 2008, attached hereto as Exhibit E).

40.     HUD failed to notify McBurnette and Sabur of this violation and on information and belief the other tenants did not receive notice either.

41.     HUD ordered the Foundation to correct the physical deficiencies at the House or be subject to acceleration of the outstanding principal indebtness, foreclosure or any other appropriate remedy. (December 9, 2008 Letter at 1).

42.     HUD further alleged that the House was given a failing score of 53c on May 4, 2007, demonstrating that the House failed to cure the alleged deficiencies noted in the June 30, 2006 REAC inspection report of the House.

43.     The Foundation certified that "all repairs required by the May 4, 2007 REAC inspection were completed.  This certification was submitted to HUD.  (See Certification of Repairs, attached hereto as Exhibit F).

44.     On February 10, 2009, HUD notified the Foundation it would move to foreclose on the House and the Addition unless the following conditions were satisfied:

      a.     All repairs required to bring the project into acceptable physical condition must be completed;

      b.     The owner must provide a certification that the project has been fully repaired;

      c.     A **REAC inspection** will be done to verify the project has been fully repaired;

      d.     This inspection will cover at least sixty percent of the units in the project, vacant as well as occupied;

      e.     The property will have to receive a score of 60 or higher before the default would be considered cured;

f.      If the physical condition default of the House is cured, the physical

condition default of the Addition would also be cured since it is based on

the default of House;

g.      If the project does not pass inspection, the owner will be required to pay

for the inspection and will have used its one-time right to cure the default;

h.      If the covenant defaults are cured, the Department will expect the financial

defaults for House and Addition to be cured within five (5) business days

of the Department's notification of the curing of the covenant default; and

i.      Once both defaults have been cured, a set forth above the Department will

stop the foreclosures.  (See HUD correspondence to the Foundation, dated

February 10, 2009, attached hereto as Exhibit G).

45.     HUD failed to notify McBurnette and Sabur of their decision to move to foreclose

if the conditions were not met, and on information and belief the other tenants did not receive

notice either.

46.     The conditions outlined in HUD February 10th letter are inconsistent with HUD

regulations.

47.     A REAC Inspection of the House was scheduled to take place on March 17, 2009.

48.     Prior to the March 17th REAC Inspection, HUD was aware that the

apartments/units located on the 2nd and 3rd floors of the House were undergoing  modernization,

off-line and not occupied.   The units were off-line due to a failed conversion to an assisted

living facility.

49.     Prior to the March 17th REAC Inspection, HUD was aware that 59 apartments

located in the House were undergoing modernization, off-line and not occupied.

50.     Prior to the March 17th REAC Inspection, HUD was aware that the off-line apartments/units were Units 201-231 (2nd Floor), consecutively and Units 301-331 (3rd Floor), consecutively.

51.     HUD regulations allow for database adjustments for property undergoing modernization work.   HUD recommends that requests for database adjustments be submitted before REAC physical property inspections so "the inspection results can fully consider approved corrections, eliminating score deductions for approved database corrections and the need for post report adjustments. 24 CFR § 200.857.

52.     Prior to the scheduled March 17th REAC Inspection, the Foundation, through its new management agent, Republic First Management Corporation, requested a database adjustment.  (See Letter from Republic First Management Corporation, dated February 23, 2009, attached hereto as Exhibit H).

53.     The Foundation requested the apartments/units located on the 2nd and 3rd floor of the House be exempted from the March 17, 2009 REAC inspection due to on-going modernization work.  (Letter from Republic First Management Corporation, dated February 23, 2009.)

54.     The Foundation's request to exempt the apartments/units of the 2nd and 3rd floors of the House was consistent with HUD regulations concerning requests for database adjustments.

55.     The inspector and REAC did not adhere to their own written guidelines and regulations, and inspected areas where modernization work was ongoing, despite the Foundation having advised them in advance of the inspection of the ongoing modernization and its request that these apartments/units not be included in the March 17, 2009 REAC inspection.  (See Exhibits H; April 15, 2009 e-mail from James Arcara (HUD), attached hereto as Exhibit I).

56.     But for the inclusion of the off-line and unoccupied apartments/units in the final REAC score, the House would have received a passing score. (Letter from Republic First Management Corporation, dated February 23, 2009.)

57.     On March 17, 2009, a physical inspection of the House was conducted by a REAC inspector.   The REAC report was generated on March 24, 2009.  (See March 17, 2009 REAC Report, attached hereto as Exhibit J).  The March 17th REAC Inspection Summary notes that the 2nd and 3rd floors of the House, including the apartments/units and the common areas, were under full renovation.  (See March 17, 2009 REAC Report at 1).

58.     Pursuant to HUD regulations, REAC Inspectors are required to inspect 60% of the Units within the subject multifamily project.

59.     The REAC Inspection included apartments/units 201, 202, 203, 204, 206, 207, 211, 212, 216, 217, 220, 221, 224, 227, 228, 230, 231.  Each of these apartments/units were off-line, undergoing modernization and were unable to be occupied.

60.     Despite HUD's knowledge that apartments/units 201, 202, 203, 204, 206, 207, 211, 212, 216, 217, 220, 221, 224, 227, 228, 230, 231 were off-line and unoccupied, the assigned HUD inspector still conducted a physical inspection of these Units. The assigned HUD Inspector deducted points for missing sinks, missing carpet, missing heating and air-conditioning units, missing refrigerators and ranges.

61.     Despite HUD's knowledge that apartments/units 303, 304, 305, 307, 308, 311, 312, 314, 315, 316, 318, 319, 320, 321, 323, 324, 326, 327, 330 and 331 were off-line, unoccupied and undergoing modernization, the assigned HUD inspector still conducted a physical inspection of these Units. The assigned HUD Inspector deducted points for missing

sinks, missing carpet, missing heating and air-conditioning units, missing refrigerators and ranges.

62.     The inspection sampling was statistically flawed because 37 of the 59 apartments/units that were off-line, unoccupied and undergoing modernization, were included in the physical inspection score. (See GAO Report, HUD Inspections at 2-4, attached hereto as Exhibit K).

63.     The inspection sampling was statistically flawed because HUD knew which apartments/units were off-line, unoccupied and undergoing modernization, therefore the sampling was not random, as required by HUD's own regulations.

64.     Sometime after March 24, 2009, the Foundation obtained a copy of the March 17th REAC Inspection.

65.     The REAC Inspector gave a final physical inspection score of 42, deducting points based on his physical inspection of the apartments/units that were off-line, unoccupied and undergoing modernization.

66.     Pursuant to HUD's regulations, properties that receive a REAC physical score of 60 or below will be referred to the HUD Departmental Enforcement Center (DEC).

67.     Contrary to HUD regulations, the House was not referred to the Departmental Enforcement Center.

68.     While the Foundation and its new management agent were working toward resolution, a completely separate division of HUD, the Atlanta Multifamily Property Disposition Center, began to take separate action, which was different than the action taken by HUD on February 10, 2009.

69.     On March 31, 2009, HUD Director William H. Melvin (Atlanta Multifamily Property Disposition Center) notified the Foundation that it was in default on the Regulatory and Loan Agreements on the House and the Addition.  HUD required the Foundation to respond within twenty-one (21) days, setting forth reasons why a foreclosure on the House and Addition should not take place.  (See Letter from William H. Melvin, Director of HUD, dated March 31, 2009, attached hereto as Exhibit L).

70.     HUD failed to notify McBurnette and Sabur of the default and on information and belief the other tenants did not receive notice either.

71.     The March 31, 2009 letter from HUD was contrary to the procedures set up on February 10, 2009 by HUD for resolution of the issues regarding the alleged defaults of the Regulatory and Loan Agreements.

72.     On April 23, 2009, the Foundation, through its legal counsel, responded to Mr. Melvin's letter of March 31, 2009.  (See Letter from Foundation to William Melvin (HUD Director), dated April 23, 2009, attached hereto as Exhibit M).  The Foundation informed William Melvin (HUD Director) that it intended to question the methodology of the March 17, 2009 REAC inspection, specifically the inspection of the 2nd and 3rd floors of the House.  (Letter from Foundation to William Melvin, dated April 23, 2009 at 2).  The Foundation further informed Mr. Melvin (HUD Director) that the REAC Inspection was not officially released and was undergoing internal review at HUD.

73.     On April 24, 2009, the Foundation, filed an appeal of the March 17th REAC Inspection, requesting a technical review and database adjustment pursuant to HUD regulations found at 24 CFR 200.857(d) and (e).  (Appeal Letter from Foundation to Samuel X. Tuffour (HUD), dated April 24, 2009 at 1, attached hereto as Exhibit O).

74. On April 30, 2009, HUD released the March 17, 2009 REAC Inspection (325838) to the Foundation. (See Notice of Release of March 17, 2009 REAC Inspection (325838), attached hereto as Exhibit P).

75. On May 6, 2009, Vida Velazquez (HUD) informed the Foundation that HUD was in receipt of the appeal and request for a technical review and database adjustment. Ms. Velazquez further informed the Foundation that the appeal could not be processed because March 17th REAC Inspection had not been released. (See Letter from Vida Velazquez (HUD) to Foundation's Counsel, dated May 6, 2009, attached hereto as Exhibit N).

76. HUD refused and continues to refuse to process the Foundation's timely request for a Technical Review and a Database Adjustment of the March 17th REAC Inspection.

77. HUD violated its own regulations and denied the Foundation its due process rights guaranteed by the United States Constitution when it arbitrarily and capriciously denied the Foundation's appeal of the March 17th Inspection.

78. On May 28, 2009, counsel for the Foundation attempted to have the Foundation's appeal reviewed. (See Letter and attachments from Gerald H. Salzman to William Melvin, dated May 28, 2009, attached hereto as Exhibit Q).

79. On June 10, 2009, HUD rejected the Foundation's request to process its appeal. (See Letter from William Melvin (HUD Director), dated June 10, 2009, attached as Exhibit R).

80. On January 4, 2010, HUD served the Foundation with a Notice of Foreclosure. (See Notices of Foreclosure attached hereto as Exhibit S and T, respectively). The foreclosure notice pertained to the House and the Addition, with a scheduled date of February 4, 2010.

81. HUD failed to serve this Notice of Foreclosure on McBurnette and Sabur and on information and belief the other tenants were not served with the notice either.

82.     On January 12, 2010 HUD conducted a REAC Inspection of the Addition.  The Addition received a passing score of 94.

83.     A physical inspection score of 94 is significant because it classifies the property as a "Standard 1 Performing Property."  Pursuant to 24 C.F.R. § 200.857(b)(1) , a  "Standard 1 Performing Property" is only required to undergo a physical inspection once every three (3) years.

84.     The Addition's REAC Inspection score clearly indicates that the Foundation and its new management agent is providing safe and sanitary conditions to the residents of the *Brith Sholom House.*

85.     The Foundation is able to cure any alleged monetary default.  (See Declaration of Jose Camacho, attached hereto as Exhibit W.)

86.     HUD, however, has arbitrarily refused to stop the foreclosure proceedings now scheduled for February 26, 2010, without just cause.

87.     Furthermore, the Bid Packet issued by HUD which describes the conditions of purchase and sale of *Brith Sholom House* at foreclosure does not include a requirement that a purchaser continue to operate *Brith Sholom House* in accordance with the terms Section 202 and 236 properties, as required by law.  12 U.S.C. § 3706(2)(A).  (See Full Bid Packet, attached hereto as Exhibit BB).

## COUNT I

**Foundation v. HUD**
**Violation of Due Process**

88.     The Foundation hereby incorporates paragraphs 1-87 as though fully set forth at length.

89.     HUD has refused to follow its own guidelines and regulations regarding REAC Inspections and the appeal rights of affected owners.

90.     HUD has no legal authority to circumvent its own regulations regarding REAC Inspections and the appeal rights of affected owners.

91.     HUD has denied the Foundation due process of law by circumventing its regulations regarding REAC Inspections and the appeal rights of the Foundation.

92.     The Foundation attempted to resolve the alleged default of the Regulatory and Loan Agreement on the House by following HUD's regulations and stated appeal process and rights afforded to the Foundation.

93.     HUD failed to follow its rules and regulations regarding REAC Inspections.

94.     HUD deprived the Foundation of its right to cure the alleged default of the Regulatory and Loan Agreement by not following its own regulations relating to REAC Inspections and the appeal process.

95.     HUD's refusal to follow its own rules, regulations and guidelines deprived the Foundation of its due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

96.     HUD's refusal to follow its own rules, regulations and guidelines was arbitrary, capricious and without legal justification.

97.     HUD violated the Foundation's constitutional right not to be deprived of property without due process of law.

98.     HUD's decision to seek foreclosure on the House and Addition is without legal justification.

99.     HUD's decision to seek foreclosure on the House and Addition is arbitrary, capricious, and an abuse of power granted by Congress.

100.     If the foreclosure is allowed to proceed, the Foundation and its current residents will suffer irreparable harm, which includes, but is not limited to,:

      a.     The Foundation will no longer be able to fulfill its mandate of operating and maintaining the *Brith Sholom House*, a permanent national home for senior citizens;

      b.     The Foundation will no longer be able to provide the residents of the *Brith Sholom House* with services related to the original purpose of the creation of the *Brith Sholom Foundation* and the *Brith Sholom House* as a residential home for senior citizens of the Jewish faith and other religious backgrounds; and

      c.     The Foundation will no longer be able to provide the residents of the *Brith Sholom House* with educational and cultural services mandated by the original Deed of Trust;

101.     If the foreclosure were allowed to proceed, HUD intends to allow the rents to be substantially increased in the following manner:

      a.     If the Foreclosure is permitted to take place, the residents monthly rent will no longer be subsidized by the Foundation;

      b.     The residents currently renting apartments for $455 per month will be subjected to an increase equal to $682 per month;

      c.     The residents currently renting apartments for $561 per month will be subjected to an increase equal to $781 per month;

    d.      The residents currently renting for $698 per month will be subjected to an increase equal to $781 per month; and

    e.      The residents currently renting for $728 per month will be subjected to an increase equal to $781 per month.

    f.      HUD will allow any current resident to evicted, subject to the terms of the individual's current lease, which is generally month-to month, after the first year.

102.    There is no adequate remedy at law to cure the harm that has been suffered and will be suffered by the Foundation if the foreclosure and sale of *The Brith Sholom House* is permitted to take place on February 4, 2010.

## COUNT II

### McBurnette and Sabur v. HUD
### Violation of Due Process and Statutory and Regulatory Obligations

103.    The Foundation hereby incorporates paragraphs 1-102 as though fully set forth at length.

104.    HUD has failed to follow its statutory and regulatory obligations to provide notice to each tenant in the building by delivery or first class mail of an impending foreclosure 60 days prior to the date of foreclosure.  12 U.S.C. §1701z-11(c)(3)(A), 24 C.F.R. 290.11(b).  This notification needed to "identify the project acquired or to be foreclosed by HUD; provide the general terms and conditions concerning the sale, future use, and operation of the project as proposed by HUD; indicate the time by which any offers must be made or any comments must be submitted; and state that the full disposition recommendation and analysis and other supporting information will be available for inspection and copying at the HUD Field Office." 240 C.F.R. 290.11(d).

105.    HUD has failed to follow its statutory obligation to obtain appropriate and timely input into disposition plans from the tenants.  12 U.S.C. §1701z-11(c)(2)(D).

106.    HUD has failed to follow its statutory obligation to provide tenants with adequate notice of, reasonable access to relevant information about, and an opportunity to comment on HUD's disposition of a project owned by the Secretary and that such comments be taken into consideration by the Secretary. 12 U.S.C. §1715z-1b.

107.    HUD has denied the tenants their due process of law guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution by failing to provide adequate notice.

108.    HUD has failed to follow its statutory obligation under the Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C. § 3701-3717, to require "as a condition and term of sale, any purchaser (other than the Secretary) to operate the property in accordance with such terms, as appropriate," of the current program under Section 202 and 236.  12 U.S.C. § 3706(2)(A).

109.    HUD's decision to seek foreclosure on the House and Addition is without legal justification.

110.    HUD's decision to seek foreclosure on the House and Addition is arbitrary, capricious, and an abuse of power granted by Congress.

111.    If the foreclosure is allowed to proceed, McBurnette, Sabur and on information and belief, the other current residents will suffer irreparable harm, which includes, but is not limited to,:

    a.    The residents will likely no longer receive the services and care currently provided by the Brith Sholom Foundation.

    b.    The residents will likely face a substantial raise in their rent because the Brith Sholom Foundation will no longer be subsidizing their rent.  The

residents will not be able to afford this increase in rent and will be forced to move out.

c.      The residents, including McBurnette and Sabur, currently renting apartments for $455 per month will be subjected to an increase equal to $682 per month;

d.      The residents currently renting apartments for $561 per month will be subjected to an increase equal to $781 per month;

e.      The residents currently renting for $698 per month will be subjected to an increase equal to $781 per month; and

f.      The residents currently renting for $728 per month will be subjected to an increase equal to $781 per month.

g.      HUD will allow any current resident to evicted, subject to the terms of the individual's current lease, which is generally month-to month, after the first year.

112.    There is no adequate remedy at law to cure the harm that has been suffered and will be suffered by McBurnette, Sabur, and on information and belief the other tenants if the foreclosure and sale of *The Brith Sholom House* is permitted to take place on February 26, 2010.


## **RELIEF**

Wherefore, the Brith Sholom Foundation, McBurnette and Sabur request the following relief:

1.      A temporary and permanent injunction enjoining the United States Department of Housing and Urban Development ("HUD") from proceeding with Foreclosure Proceedings scheduled for February 26, 2010;

2.      Mandating that HUD enter into good faith negotiations with the Foundation to enter into a workout arrangement that would permit the Foundation to cure any and all monetary defaults without penalty;

3.      Reasonable attorney's fees and costs under 28 U.S.C. § 2412; and

4.      All other appropriate relief.

Date: February 8, 2010

*/s/ Jeffrey M. Scott*

BY: _____

Jeffrey M. Scott
Jay S. Ruder
Archer & Greiner, P.C.
One Liberty Place, 32nd Floor
1650 Market Street
Philadelphia, PA 19103-7393
Tel: 215 963-3300
Fax: 215 963-9999
Counsel for Plaintiff Brith Sholom
Foundation

By: */s/ Rachel Garland*
Rachel Garland
George Gould
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19103
Tel: 215-981-3700
Fax: 215-981-0434
Counsel for McBurnette and Sabur

5266205v1